# THE SUPREME COURT

#### OF THE

# STATE OF NEVADA

## OCTOBER TERM, 1905

[No. 1659.]

## EX PARTE PETER KAIR.

1. EVIDENCE — RELEVANCY — EIGHT-HOUR LAW — CONSTITUTIONALITY. On an attack on the constitutionality of the act of February 23, 1903 (Stats. 1903, p. 33, c. 10), imposing a penalty on any one working more than eight hours a day in any mine, smelter, or mill for the reduction of ores, on the ground that such labor was not dangerous to health, evidence that particular reduction works and mills, including the one in which petitioner worked, were healthful, as distinguished from the healthfulness of mills in general throughout the country, was inadmissible.

2. CONSTITUTIONAL LAW—DEPRIVATION OF PROPERTY—RIGHT TO LABOR DUE PROCESS OF LAW. The act of February 23, 1903 (Stats. 1903, p. 33, c. 10), regulating the hours of labor in mines, smelters, and mills for the reduction of ores, is not unconstitutional as depriving the miner of liberty and property without due process of law.

PETITION for rehearing. **Denied.**

Original decision affirmed. [For original decision, see page 140 of this volume.]

*Alfred Chartz,* for Petitioner.

*James G. Sweeney,* Attorney-General, for Respondent.

By the Court, TALBOT, J.:

In the petition for rehearing it is said that we determined that the petitioner's imprisonment was not in violation of the civil rights guaranteed to him by the constitution of the

State of Nevada, but that we did not decide the questions raised as to whether his detention was in violation of the rights guaranteed to him under the fourteenth amendment to the constitution of the United States, and as to whether he was imprisoned without due process of law, and whether his fine was excessive.

The petition further states: "That, since the rendition of the opinion of the Supreme Court of the State of Nevada declaring an eight-hour law constitutional under the police power of the state, the Supreme Court of the United States has declared such law unconstitutional in the case of *Lochner* v. *State of New York*, 25 Sup. Ct. 539, 49 L. Ed. 937, on the ground that 'no state can deprive any person of life, liberty or property without due process of law,' and 'the right to purchase or to sell labor is part of the liberty protected by this document, unless there are circumstances which exclude the right,' and 'the general right to make a contract in relation to his business is part of the liberty of the individual protected by the fourteenth amendment to the constitution.' Statistics were quoted to show that the occupation of baker was not particularly unhealthful, showing that outside evidence can be introduced to vary the judgment of the legislature. Justice Harlan, in dissenting, said it was the most important decision rendered by the Supreme Court of the United States within a century, proving that the case of *Holden* v. *Hardy*, 169 U. S. 368, 18 Sup. Ct. 383, 42 L. Ed. 780, did not decide the question of the right of men *sui juris* to contract one with the other. That your petitioner is not fully informed of the decision of the Supreme Court of the United States in the case of *Lochner* v. *State of New York*, but believes the same to be controlling in the case at bar."

At the time the rehearing was ordered the press dispatches indicated that the Supreme Court of the United States had reversed the decision of the New York Court of Appeals in the Lochner case, 69 N. E. 373, 101 Am. St. Rep. 773, but the publication of the full text of the decision had not arrived. From a review of that case (25 Sup. Ct. 539, 49 L. Ed. 937) it appears that the New York statute providing a ten-hour day for bakers was upheld by the Oneida County court, by

three of the five judges of the supreme court, and by four of the seven justices of the court of appeals of that state, and that it was finally declared unconstitutional by five of the nine justices of the Supreme Court of the United States. It will be seen that twelve of these judges deemed the act valid, and that ten of them considered it unconstitutional. The decisions being by a bare majority in every court through which the case passed, no question has ever presented a sharper diversity of opinion among able jurists than the validity of this statute concerning bakers. The same cannot be said regarding the acts limiting the hours of labor in mines and mills for the reduction of ores. The legislative enactment from which ours is copied was sustained by the full bench in Utah, and by seven of the nine justices of the Supreme Court of the United States in *Holden* v. *Hardy*.

The Supreme Court of Missouri, in the Cantwell case (78 S. W. 569) unanimously upheld the law, making an eight-hour day for underground miners in that state, and all agreed that testimony tending to show that the work was not unhealthful could not be received to overthrow the statute. The only decision found to the contrary is the strained one in *Re Morgan* (Colo. Sup.) 58 Pac. 1071, 47 L. R. A. 52, 77 Am. St. Rep. 269, which led to so much trouble, suffering, and loss of life in Colorado. The opinions of the majority, as well as those of the minority, in the Lochner case, refer to and approve the decision in *Holden* v. *Hardy*, which sustains the Utah act similar to ours, and Justice Brown, who wrote the opinion of the court in the last-named case, concurred with the majority in the other. The court of last resort was careful to distinguish between the two.

In the decision of the United States Supreme Court in *Lochner* v. *New York*, it is said: "Among the later cases where the state law has been upheld by this court is that of *Holden* v. *Hardy*, 169 U. S. 366, 42 L. Ed. 780, 18 Sup. Ct. 383. A provision in the act of the Legislature of Utah was there under consideration; the act limiting the employment of workmen in all underground mines or workings to eight hours per day, except in cases of emergency, where life or property is in imminent danger. It also limited the hours

of labor in smelting and other institutions for the reduction
or refining of ores or metals to eight hours per day, except
in like cases of emergency. The act was held to be a valid
exercise of the police powers of the state. It was held that
the kind of employment and the character of the employees
in such kinds of labor were such as to make it reasonable
and proper for the state to interfere to prevent the employees
from being constrained by the rules laid down by the pro-
prietors in regard to labor. * * * There is nothing in
*Holden* v. *Hardy* which covers the case now before us.
* * * The case differs widely, as we have already stated,
from the expressions of this court in regard to laws of this
nature, as stated in *Holden* v. *Hardy*." And in the dissent-
ing opinions Justice Holmes said: "The law sustaining
an eight-hour day for miners is still recent." And Justice
Harlan: "So, as said in *Holden* v. *Hardy*, 'this right of
contract, however, is itself subject to certain limitations,
which the state may lawfully interpose in the exercise of its
police powers.'"

The cases are distinguished on a question of fact, work in
bakeries not being considered more unhealthful than in ordi-
nary employments by the majority of the court, while evi-
dently the opposite was held in regard to labor in mines and
mills for the reduction of ores. Justice Peckham, in the opin-
ion of the court, said: "We think there can be no fair doubt
that the trade of a baker, in and of itself, is not an unhealth-
ful one to that degree which would authorize the legislature
to interfere. In looking through statistics regarding all
trades and occupations, it may be true that the trade of a
baker does not appear to be as healthful as some other trades,
and is also vastly more healthful than still others. To the
common understanding the trade of a baker has never been
regarded as an unhealthful one. * * * It seems to us
that the real object and purpose were simply to regulate the
hours of labor in a private business not dangerous in any real
and substantial degree to the health of the employees."

The conclusion of the Supreme Court of the United States
was quite different regarding the effect of labor in quartz-
mills, where, in adopting the language of the Supreme Court

of Utah in *Holden* v. *Hardy*, it was said: "Poisonous gases, dust, and impalpable substances arise and float in the air in stamp-mills, smelters, and other works in which ore containing metals, combined with arsenic or other poisonous elements or agencies, are treated, reduced, and refined; and there can be no doubt that prolonged effort, day after day, subject to such conditions and agencies, will produce morbid, noxious, and other deadly effects in the human system. Some organisms and systems will resist and endure such conditions longer than others." That the legislature may regulate and limit the hours of labor in employments that are dangerous and especially unhealthful is no longer open to doubt. That underground mining, and the smelting, milling, and reduction of ores, are occupations of that kind and subject to reasonable legislative regulations such as this act provides, we think is well settled by these decisions in Missouri and Utah, and by the Supreme Court of the United States in *Holden* v. *Hardy*, and in New York, and by this court in *Ex parte Boyce*, 27 Nev. 299, 75 Pac. 1, 65 L. R. A. 47.

The question remains whether the particular mill and employment in which petitioner worked should be exempted from the operation of the statute under his claim that labor there is not unhealthful. Subject to objection and to the admissibility of the evidence being determined later, witnesses have been sworn and interrogated before us regarding this mill and a few other wet-crushing ones in that vicinity. On behalf of petitioner they testified that labor in wet-crushing quartz-mills is perfectly healthful and preferable to outside work; that the danger depends upon the construction of the mill; that there is no dust in the Dazet and other wet-crushing mills in that vicinity, and no danger in amalgamating, if the men do not let the pans get too hot and are careful about raising the lid; that they do not need to get their hands and feet wet; and that work around cyanide plants is unusually healthful. On cross-examination witnesses admitted that some mills are unhealthful because improperly constructed, that dust may arise from rock breakers in wet-crushing mills, that they had known men to become salivated, that the constant din of the battery may affect the hearing, that cyanide

produced sores on the skin of men who were careless in shoveling out tanks, and that work around the pans is considered unhealthful. For the petitioner a physician of twenty-eight years' experience stated that he knew of no specific disease peculiar to millmen, except possibly, miner's consumption, which might arise from the dust floating in the mills; that the din may injure the hearing in some cases; that the jar would not affect the kidneys of a strong man; that during seven years' experience at a mining town in the eastern part of the state he found that men engaged with free-milling ores were generally healthy, and those engaged with base ores containing lead and such substances were liable to be injured; that work in underground mines was more injurious than in mills; and that men had become afflicted with miner's consumption on the Comstock.

A witness for the state testified that he had worked in the Dazet Mill, the one in which petitioner was employed; that a car of ore is run onto and dumped over a grizzly about every fifteen minutes, and quite a dust arises; that a rock breaker with large jaws makes flinty dust, and after a man works there awhile he can spit it out in chunks, and that the dust settled over the mill; that he never saw a man clean the battery that did not get wet; that he had worked with hundreds of men in mills, and had heard them complain, and knew their hearing and nerves were affected; that the jar injured his kidneys; that he knew a man who had been stricken with paralysis in a cyanide plant; and that his brother-in-law died from working in mills. Other witnesses testified that men became salivated, and that prolonged employment in mills had a tendency to cause deafness and nervousness and to break down the system; that the men who perform the labor in these institutions generally consider the work unhealthful; and that they knew of deaths resulting.

The testimony does not extend to the mills and reduction works generally throughout the state, and is conflicting, and does not show clearly that prolonged labor in them and in the particular employment of a general millman, followed by the petitioner, would not result in real and substantial injury to workingmen of ordinary vitality. However, feeling still

in accord with the Supreme Court of Missouri in the Cant-
well case, we think this evidence cannot be received or con-
sidered to affect the constitutionality of the statute. If, for
the purpose of the argument, it be conceded that no one has
been seriously affected in health by laboring in this particu-
lar mill during the past few years, and that the petitioner
has followed with impunity his avocation for a period longer
than the usual life, this does not prove that months and
·years of labor in this and other quartz-mills may not disable
or greatly injure men of common physical powers. The evil
results are not always immediate nor easily ascertained in
advance. Minds may honestly differ as to whether they will
ever occur. Under certain conditions some, and especially
those who are interested, may earnestly believe that particu-
lar mills and part of the labor in them should be immune
from this enactment; but the future may prove the wisdom
of the legislature in regard to them, as the past has done
concerning underground mines and institutions generally for
the reduction of ores. If exceptions were to be made, based
on the peculiarities of the mill or its method of operation, or
on the chemicals used, or on the ingredients of the ore, or on
the ability of some workmen to maintain their health longer
than others, there would be great uncertainty and much liti-
gation in securing the benefits of the act, and it could thereby
be nullified to a great extent.

The fact that controls the decision in the Lochner case—
the finding of the majority of the court of last resort—that
the trade of a baker is not more unhealthful than ordinary
occupations, appears to be based on judicial knowledge aided
by statistics and general information, and not upon testi-
mony. Essentially the same is true of the conclusion of this
court in this case and in *Ex parte Boyce*, and of the opinion
reached in *Holden* v. *Hardy* by the court in Utah, and fol-
lowed and approved by the Supreme Court of the United
States, holding that labor in mines, smelters, and institu-
tions for the reduction and refining of ores is so hazardous
and unhealthful as to justify the legislature in limiting the
hours of labor in those places. We held it was a matter of
common knowledge that men sickened and died as a result

of labor in underground mines and quartz-mills, and by way of example referred to the well-known fact that in one of the largest plants in the state the most of the men died in from a few months to two years from the effects of flinty dust from quartzite ores. Recently, and since the submission of this case, there casually appeared before this court, as a spectator during the argument of a water suit, a man in the advanced stages of miner's consumption, sallow, emaciated, and with hollow cough; an impressive exhibit of the frequent effect of work in underground mines. Testimony cannot be received to establish nor to overthrow these or other matters of judicial cognizance. If it could be taken to overturn the conclusion that labor in these places is unhealthful, for the same reasons it ought to be accepted to reverse the finding that work in bakeries is not more unhealthful than in ordinary employments.

If evidence were to be considered for the purpose of showing that a particular mill or the labor performed by some of the workmen in the reduction of certain ores is not unhealthful, and that, therefore, it should be excepted from the operation of the act, testimony should also be admissible to prove that the conditions existing in a few particular bakeries in the State of New York made them especially injurious to the health of the employees therein, and that as to them the statute ought to be enforced, notwithstanding it has been declared unconstitutional as to the bakeries generally in that state. If, regardless of the reasons and difficulties indicated here and in the opinion, testimony were receivable to limit the operation of the statute in exceptional cases, the evidence would have to be clear to render the act unconstitutional or ineffective as to them, and would have to be presented in the court having jurisdiction of the offense, and not on petition for writ of *habeas corpus*. If questions of fact not conclusively shown by judicial knowledge were to vary or restrict the control of the statute in some cases, the state and the defendant would be entitled to have them submitted to a jury in the court having jurisdiction of the offense, and the proper method for the correction of errors in that tribunal would be by appeal.

We do not find the statute to be in conflict with the fourteenth amendment, nor with any provision of the state or federal constitutions, nor do we deem the fine excessive. We realize the importance ·of the question involved, and that it borders on the line that divides the right of the individual to work, contract, and act as he may please from the power of the legislature to restrain or limit him in this regard for his benefit, and that of the community by the enactment of laws for the protection of his health, safety, morals, and the common welfare. After mature reflection we feel confirmed in the correctness of the conclusions reached in the opinion, and that the statute controls the employment followed by petitioner. If this will work unnecessary hardships without corresponding · benefits in exceptional cases, application should be made to the legislature, and not to the courts, for relief.

The petitioner is remanded, as ordered before.

FITZGERALD, C. J. (concurring):

I concur in the judgment reached by Justice TALBOT in this case, and at some time in the not distant future hope to embody my views in an opinion to be filed.

NORCROSS, J. (concurring):

I concur in the judgment and in the opinion of TALBOT, J., in so far as the same is not inconsistent with certain views of this case which I here express. I do not think that this court can say that as a matter of common knowledge prolonged labor in all classes of ore-reduction works is injurious to the health of the workmen of each respective class. That there is a difference in degree between the unhealthfulness of labor in underground mining, and in that of labor in smelters, quartz-mills, cyanide plants, and other ore reduction works, seems to be unquestioned. It would seem, also, that the legislature itself has placed labor in underground mines in a different class than labor in smelters and other ore-reduction works, for the prohibition against the employment of labor in underground mines for a longer period than eight hours is embodied in a separate section from the section containing

a general provision concerning labor in smelters and all other ore-reduction works.

When the court has said it will take judicial notice that labor in underground mines, smelters, and dry ore-crushing quartz-mills is unhealthful, I think it has gone as far as it can go in this respect, considering the general knowledge respecting the various occupations which the court can take judicial notice of. The flinty dust which escapes from the battery in the dry ore-crushing quartz-mill, and which is largely responsible for the unhealthfulness of such mill, is largely, if not entirely, removed in the wet-crushing mill. In the cyanide process, which is comparatively a recent process for the extracting of the metals from ore, the conditions are naturally different from those which ordinarily exist in the quartz-mill. It is a matter of common knowledge that changes and improvements have been made in ore-reduction processes and are continually being made, and it is too much to say that these changes and improvements may not also have affected the healthfulness of the employment. While I think it cannot be said that it is a matter of common knowledge that prolonged labor in wet-crushing quartz-mills (a large and distinctive class of ore-reduction mills) is generally productive of ill health or disease, upon the other hand we cannot say that as a matter of common knowledge it is not unhealthful to a degree which would authorize the interference of the legislature.

In the absence of authoritative knowledge to the contrary, we must presume that the legislature acted intelligently and in the interest of the public welfare, with the object in view of improving the conditions of health of a considerable class of people. The difficulty in determining what may be said to be common knowledge regarding the effect upon the health of employees engaged in any particular ore-reduction process is that there are many different processes of ore reduction, some of which are unquestionably unhealthful, while others may or may not be so; and yet, when the matter of ore-reduction processes are considered as a whole, they may readily be said to be unhealthful. Our attention has not been called to any statistics that would throw any light upon the relative

healthfulness of labor in various ore-reduction processes.  It has not been contended, either in the briefs or in the oral argument, that as a matter of common knowledge labor in wet-crushing quartz-mills was comparatively healthful.

Upon the trial of petitioner, evidence was offered showing that petitioner's occupation was an exceptionally desirable one, and that there were no conditions existing in the mill in which he was employed that might be conducive to ill health. The petition on file in this case shows that upon the trial petitioner testified regarding the nature of his employment as follows:  "All I have to do is to work the machine and see that everything goes along all right, pour quicksilver in the motor [mortar] every half an hour, and then sit down and see that everything goes along all right.  I have very little to do.  I have a good comfortable room with a stove in it, sit down and read—plenty of newspapers to read and magazines." He testified further, "that there were no fumes or gases, or anything like that; that he was raised on a farm and preferred the work in the quartz-mill to farm work; that it was as healthful as open-air work."  All of the testimony offered at the trial was to the effect that work in the Dazet quartz-mill, in which petitioner was employed, was under perfectly healthful conditions.

In addition to the testimony offered, counsel for the state and for the defendant entered into a stipulation evidently intended (if it could be accomplished in that way) to cover the facts that might be involved in a consideration of the case.  This stipulation, in so far as it refers to the character of petitioner's employment, is as follows:  "That defendant's employment and the employment of his co-servants in said Dazet quartz-mill is not unhealthful, and is not dangerous to either life or limb, and that it consists in taking care of gold plates, and feeding batteries, and attending to machinery; that there is no dust and no fumes or gases of any kind to breathe, and the air is pure and the room comfortable; that the process used for the reduction of ores in said mill is known as and called the 'copper-plate process,' which consists of crushing the rock with water in the batteries and running the pulp over copper plates, and the work is not

hard; that the machinery furnishing the power consists of belts and pulleys, and is similar to ordinary machinery used for grinding flour, and not any more dangerous than machinery used in farming operations." If labor in wet-crushing quartz-mills generally was of the character described as existing in the Dazet mill, I do not believe it could be argued, in the light of the recent decision of the Supreme Court of the United States, that such conditions would support legislation restricting the hours of labor therein, based upon the police power of the state exercised in the interest of public health.

But if we are to presume that labor in such quartz-mills generally is unhealthful to a degree that would warrant the interference of the legislature (and under the present state of intelligence upon the subject we must so presume), can evidence of conditions out of the ordinary be shown to make an exception in the application of the rule? I think not. I think the principle involved here is precisely the same as that involved in the case of *Powell* v. *Pennsylvania*, 127 U. S. 684, 8 Sup. Ct. 992, 32 L. Ed. 253, cited in the original opinion in this case (see page 140 of this volume), where a statement of the facts of that case will be found. Justice Harlan, in delivering the opinion of the Supreme Court of the United States in that case, said: "It will be observed that the offer in the court below was to show by proof that the particular article that defendant sold, and those in his possession for sale in violation of the statute, were in fact wholesome or nutritious articles of food. It is entirely consistent with that offer that many—indeed, that most—kinds of oleomargarine butter in the market contain ingredients that are or may become injurious to health. The court cannot say, from anything of which it may take judicial cognizance, that such is not the fact. Under the circumstances disclosed in the record, and in obedience to settled rules of constitutional construction, it must be assumed that such is the fact. 'Every possible presumption,' Chief Justice Waite said, speaking for the court in *Sinking Fund Cases*, 99 U. S. 700, 25 L. Ed. 496, 'is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the

government cannot encroach on the domain of another without danger.   The safety of our institutions depends in no small degree on a strict observance of this salutary rule.' * * * And as it does not appear upon the face of this statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislature's determination of those facts is conclusive upon the courts."

It will be observed in the Powell case that the court did not take judicial notice that many or most kinds of oleomargarine butter in the market contained ingredients that are or may become injurious to health, but simply that the court could not say, from anything of which it may take judicial cognizance, that such is not the fact, and that, "until the contrary is shown beyond a rational doubt, every possible presumption is in favor of the validity of the statute." Applying this reasoning to the case at bar, it is clear why this or any other court cannot act upon the evidence offered upon petitioner's trial.   I agree with counsel for petitioner that evidence may be offered in doubtful cases to establish the fact whether or not a certain occupation is or is not unhealthful, and, if unhealthful, whether or not it is unhealthful to a degree that would warrant the exercise by the legislature of the police power of the state.   Such evidence, however, must be directed to the character of the occupation generally throughout the territory covered by the statute, and cannot be confined to an individual case or a district that might be exceptional.   If in matters of this kind courts can act upon judicial knowledge, which amounts simply to taking notice of the existence of a fact recognized as of common knowledge, and hence the necessity of proof of the same not required, I see no good reason why they may not act upon facts established by competent proof.

Taking judicial notice of a fact simply does away with the necessity of offering evidence to support that fact.   While a court may refuse to hear evidence offered to contradict the existence of a fact which it can say it knows of common knowledge, I am unable to see upon what theory a court could refuse to hear evidence upon a fact of which it could

not take judicial notice. To so hold would be the equivalent of saying that in some cases the rights of an individual, guaranteed him by the constitution, could be taken away from him, because the court did not happen to take judicial notice of a fact or facts necessary to a determination of the case. "If judicial knowledge fails to disclose whether a statute is a legitimate exercise of the police power, evidence should be introduced to elighten the judicial mind." (Harvard Law Review, Feb. 1904, p. 269.)

The question, then, presents itself in this case: When and where should proof of these facts be offered? Upon the hearing of this petition, counsel for petitioner, subject to objection, offered testimony for the purpose of establishing his theory of the case that labor in wet ore-crushing quartz-mills was not an unhealthful occupation. Counsel contends that this court should consider this testimony, and in support of his contention cites a number of decisions. In none of the decisions cited did the appellate court hear the testimony of witnesses. In some of the cases cited the court referred to the testimony taken at the trial, while in others the court simply referred to certain statistics and reports outside of the record, which procedure upon the part of the court is supported by ample authority. Courts take judicial notice of many facts, which, in order to apply, require an investigation of some authority. For example, courts will take judicial notice of the time of the rising of the sun or moon upon any particular day, but it will hardly be expected that any court will be able to apply this knowledge without first making a satisfactory investigation. So, in matters affecting the public health, reference may be made to authoritative tables or statistics. (16 Cyc. 922.) Evidence upon an issue of fact necessary to a determination of the merits of a case should be offered upon the hearing of the case in the trial court. The testimony offered in this court upon the hearing of this proceeding was inadmissible, and to review it would be to no purpose.

In the recent case of *Lochner* v. *New York*, relied on by counsel for petitioner, it will be observed that the New York statute was, by the opinion of the Supreme Court of the

United States, held to be in violation of the fourteenth·
amendment of the constitution of the United States, because
the court was able to say: "To the common understanding
the trade of a baker has never been regarded as an unhealth-
ful one." Had the majority of the court expressed a doubt
upon the question, as did the minority, the statute would
have been upheld; for the Supreme Court of the United
States, in line with all appellate courts, has repeatedly held
that questions of doubt must be resolved in favor of the
statute.

The question presented in this case is one of power in the
legislature to enact a certain law. It is a fundamental prin-
ciple that courts will not interfere to annul an act of the
legislature, unless plainly and beyond reasonable doubt in
violation of organic law. The constitution has made the
legislature the exclusive judge of the wisdom, policy, and
expediency of laws. When a statute is questioned before
the court, its sole province is to measure it by the limits
fixed by the state and federal constitutions. Tested by this
rule and the facts as shown by the record, it cannot be said
that the section of the act in question is void.