[No. 1890]

HENRY RITER, Appellant, *v.* W. G. DOUGLASS, as Secretary of State of the State of Nevada, Respondent.

1. Constitutional Law—Federal Constitution as Grant or Limitation of Powers.

Congress has no legislative power beyond that expressly granted or clearly implied by the constitution.

2. Constitutional Law—Constitutionality of Statutes—Presumption.

Since the legislature can pass any act not expressly prohibited by the state or national constitution, an act is presumed to be constitutional until declared otherwise by a court of competent jurisdiction.

3. Constitutional Law—Statutes—Who Entitled to Question Validity.

Questions of the wisdom, policy or expediency of a law are for the legislature's determination, with which courts cannot interfere.

4. Elections—Direct Primary Law—Legislative Power.

Enactment of a primary election law is an inherent right of the legislature under the constitution.

5. Elections—Direct Primary Law—Constitutionality—Invading Right of Suffrage.

The direct primary law of March 23, 1909 (Stats. 1909, c. 198), is not unconstitutional as destroying political parties, nor as denying electors the right to determine the political principles their candidates must espouse, nor as enabling electors of opposite political faith to name the candidates of their political opponents.

6. Elections—Primary Legislative Power.

The state has the right under the police power vested in its legislature to make reasonable regulations in the interest of public welfare for the nomination of candidates of the various parties.

7. Elections—"Political Parties."

Political parties are organizations of electors entertaining the same political opinions, attempting through an organization to elect officers of their own party faith and make their political doctrines the policy of the government.

8. Elections—Right to Vote—Nature.

The right to vote conferred by article 2, section 1, of the constitution is a mere political privilege, and not an inherent, unqualified personal or political right.

9. Elections—Political Parties—Rights.

The rights of political parties can be no greater than the rights of electors under the constitution.

10. Elections—Direct Primary Law—Constitutionality.

The direct primary law of March 23, 1909 (Stats. 1909, c. 198), is not unconstitutional as violating article 1, section 2; of the constitution, providing that all powers are inherent in the people, nor section 20, providing that the enumeration of rights therein shall not impair or deny others retained by the people.

Points decided

11. ELECTIONS—DIRECT PRIMARY LAW—CONSTITUTIONALITY.

The direct primary law of March 23, 1909 (Stats. 1909, c. 198), is not unconstitutional as violating article 1, section 10, of the constitution, permitting the people to assemble for the common good and to instruct their representatives.

12. ELECTIONS—DIRECT PRIMARY LAW—VALIDITY.

The direct primary law of March 23, 1909 (Stats. 1909, c. 198), is not invalid because it requires participating electors to declare a present intention to support the nominees for whom he votes.

13. ELECTIONS—ELECTORS—QUALIFICATIONS.

Article 2, section 1, of the constitution, prescribing the qualification of electors and guaranteeing their right to vote, applies to the election of public officers, and not to the selection of party nominees.

14. ELECTIONS—"PRIMARY ELECTION."

A "primary election" is one for the nomination of candidates of the various parties.

15. ELECTIONS—PRIMARY ELECTIONS—CLASSIFICATION OF PARTIES—LEGISLATIVE POWER.

The legislature can in regulating primary elections prescribe qualifying classifications for political parties who desire to be represented on official ballots.

16. ELECTIONS—DIRECT PRIMARY LAW—VALIDITY.

The direct primary law of March 23, 1909 (Stats. 1909, c. 198), is not invalid as failing to provide a method by which parties other than those designated may be represented upon the ballot, in view of section 5, subdivision "c," which provides that the act shall not prevent independent nominations according to existing laws.

17. ELECTIONS—DIRECT PRIMARY LAW—VALIDITY.

The direct primary law of March 23, 1909 (Stats. 1909, c. 198), is not invalid as depriving political parties of the right to say who shall be members thereof, and forcing the admission as a member of any elector declaring an intent to support the nominees.

18. ELECTIONS—DIRECT PRIMARY LAW—VALIDITY.

The direct primary law of March 23, 1909 (Stats. 1909, c. 198), is not invalid because limiting voters to a ballot for one candidate for each office.

19. ELECTORS—CANDIDATES—QUALIFICATIONS—LEGISLATIVE POWER.

The legislature can add qualifications to electors desiring to become candidates for specified offices if the qualifications are reasonable and constitutional.

20. CONSTITUTIONAL LAW—DIRECT PRIMARY LAW—VALIDITY—PARTIES ENTITLED TO QUESTION.

Only one whose rights are affected can assert the unconstitutionality of the direct primary law of March 23, 1909 (Stats. 1909, c. 198), on the ground that it prevents one from being a candidate who has been defeated at a primary election.

21. ELECTIONS—DIRECT PRIMARY LAW—VALIDITY.
    The direct primary law of March 23, 1909 (Stats. 1909, c. 198), is not invalid because it requires the payment of fees·as a condition precedent to becoming a candidate; the fee being a reasonable one.

22. ELECTIONS—DIRECT PRIMARY LAW—VALIDITY.
    The direct primary law of March 23, 1909 (Stats. 1909, c. 198), is not invalid because it requires of candidates an oath of fealty to their party which differs from the oath required by article 15, section 2, of the constitution, since that section applies only to persons about to enter office.

23. ELECTIONS—ELECTORS—QUALIFICATIONS.
    No religious test can be made a qualification of an elector.

24. ELECTIONS—DIRECT PRIMARY LAW—VALIDITY.
    The direct primary law of March 23, 1909 (Stats. 1909, c. 198), is not invalid as prohibiting the nomination of independent candidates, since section 5, subdivision "c," thereof expressly authorizes such nomination.

25. CONSTITUTIONAL LAW—DIRECT PRIMARY LAW—VALIDITY—WHO ENTITLED TO QUESTION.
    The constitutionality of the direct primary law of March 23, 1909 (Stats. 1909, c. 198), can only be questioned on the ground that it precludes a qualified elector and candidate from appearing on the official ballot, or precludes any qualified elector from voting for any qualified candidate, by one deprived of such right.

APPEAL from the District Court of the First Judicial District of the State of Nevada, Ormsby County; *F. P. Langan*, Judge.

Action by Henry Riter against W. G. Douglass, Secretary of State. From a judgment for defendant, plaintiff appeals.
**Affirmed.**

The facts sufficiently appear in the opinion.

*L. A. Gibbons* and *James T. Boyd*, for Appellant:

As said by the Supreme Court of the State of California in discussing a similar law: "There is at once to be perceived an express limitation upon the powers of political parties, which hitherto they have exercised, of adopting their own modes for the election of their candidates. It is a part of the political history of this state and of the United States that such powers, whether resting in right or merely in the permissive silence of the legislature, have been freely enjoyed." (*Britton* v. *Board of Election Commissioners*, 129 Cal. 341.)

When a party is denied rights long used, the electors of the

party and they alone are denied those rights. "All our election laws recognize in their substance and spirit that the only effective political action under a free constitution is that which is exercised by a combination of voters through the medium of party organization, and it follows that any discrimination against parties or their candidates is a discrimination against the electors composing the party." (Beatty J., in *Murphy* v. *Curry*, 137 Cal. 487.)

We contend that the political power exercised by electors in the formation of political parties, promulgation of platforms and nomination of candidates was expressly reserved to them by section 2 of article 1 of our constitution, which provides, among other things: "All political power is inherent in the people," and by section 20 of article 1, which is as follows: "This enumeration of rights shall not be construed to impair or deny others retained by the people."

The above views are amply sustained by the case of *Britton* v. *Board of Election Commissioners*, 129 Cal. 337.

The law denies electors the right to determine the political principles that their candidates must espouse, and thus denies electors the right to instruct their representatives. The primary law enables electors of opposite political faith to name the candidates of their political opponents. If it be said that political parties are recognized by the primary law, it can be answered that they are recognized only to be destroyed. There is the further answer that under the guise of maintaining the integrity of parties and the purity of elections, a political party cannot be debauched and forced to permit candidates to go before the people as representing the party when those candidates have been nominated by their political opponents.

The law is void in that it denies certain political parties the right to participate in primary elections authorized by the act, and provides no method by which their candidates may appear upon the official ballot. It may be contended that the law does not destroy political parties, but recognizes them. If we admit this to be the fact for argument's sake, the law is not helped. Section 21 of article 4 of our constitution provides: "In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all

laws shall be general and of uniform operation." It will not be disputed that a general law can be made applicable to elections and to all political parties. (See *Marsh* v. *Hanly*, 111 Cal. 371.) The proper construction of the foregoing provision of the constitution is familiar law. It means that a law dealing with a certain class must give all belonging to that class the same benefits and impose upon them equal burdens. And if the law in question fails to do so, it violates the above provision of the constitution.

We again remark that there is under the laws of Nevada no way in which the parties excluded from the primary law may place, as a party, candidates upon the official ballot.

In *Fields* v. *Osborne*, 60 Conn. 544, the court said: "The element of time is not essential to the formation of a legal party. It may spring into existence from the exigencies of a particular election, and with no intention of continuing after the exigency has passed. To hold the contrary would strike a blow at that independence in political action upon which the good government of a locality may depend. Now, can the number of voters that must be united in order to form a legal party be prescribed by law without violating one of the fundamental theories of popular government? If it is shown, as it is in this case, that an independent political party was formed, that it assumed a distinctive name, and that the ballots which it issued sought the suffrages under no false title, but bore the name of the political party issuing them, it is enough, so far as the point now being considered is concerned. To hold otherwise would be to abridge rights which are not only generally held to be sacred, but which it is of the utmost importance to preserve." (See, also, *Eaton* v. *Brown*, 96 Cal. 375.)

The law is void in that it deprives political parties of the right to say who shall be members thereof, and forces each political party to admit as a member any elector who complies with the legislative test. Our argument upon this point is: A political party has the right to say who shall compose its members, and for that purpose has the right to impose whatever tests it may desire upon those seeking to become members and to discipline its members as it may see fit, arbitrarily, if you please, and neither the legislature nor courts can interfere

with that right.  If a party had not this right, and the right
is outside the party, then it has no certain tenure of life, for
the one holding this right can betray, disorganize, misrepre-
sent, and destroy the party by forcing it to accept as members
those who will accomplish these results.  A party has this
power or the legislature has the power.  There is no half-way
business about it.  In its ultimate analysis, the legislature
means the majority of its members.  If they have the power
to prescribe party tests, any political party preserves its
integrity only by the majority's grace and good will—rare
flowers in a political garden.  A political party in its own
internal management, like any other voluntary society, is
beyond the reach of the legislature, and is beyond the reach
of a court, save that the court may prevent fraud and mis-
representation attempted to be practiced upon it.  "A political
party is an association of citizens who agree on certain lines
of policy; and the purpose for which it exists is to impose
that policy upon the government." (Temple, J., in *Britton* v.
*Board, supra.*)  To the point that courts will prevent frauds
upon electors, and the misrepresentations of political parties,
we cite:  *Whipple* v. *Owen*, 50 Pac. 861; *Whipple* v. *Broad*, 25
Colo. 407; *Southhall* v. *Griffith*, 37 S. W. 577; *Alkeson* v. *Lay*,
115 Mo. 538; *State* v. *Rotwitt*, 18 Mont. 502; *State* v. *Elliott*, 17
Wash. 18; *State* v. *Reek*, 18 Mont. 557; *Certificates of Nomination
of McKinley Citizens' Party*, 6 Pa. Dist. Rep. 109; *State* v. *Piper*,
50 Neb. 42; *State* v. *Tooker*, 18 Mont. 540; *Baker* v. *Election
Commrs.*, 110 Mich. 635; *Reeves's Nom.*, 3 Pa. Dist. Rep. 637;
*Matter of County Clerk*, 21 Misc. Rep. 543; *Matter of Broat*, 6
Misc. Rep. 445.)  If the courts will prevent frauds upon parties,
it is for the reason that parties have rights; the legislature can-
not authorize frauds which a court would prevent.

The law is unconstitutional in that it prevents one from being
a candidate for office if he has been defeated at a primary
election.  A person derives his right to become a candidate
for office from the constitution.  If he is qualified under the
constitution, the legislature cannot take away that right or
impose conditions upon its exercise.  (McCrary on Elections,
sec. 312.)  Under the constitution of the State of Nevada any
qualified elector may be a candidate for any office within the

state, provided he is not holding a lucrative office under the government of the United States or any other power. (Const. Nev. art. 4, sec. 9, and art. 15, sec. 3.) There is a special qualification for the office of governor (art. 5, sec. 3). The primary law provides that "a candidate defeated at a primary election held under the provisions of this act shall be ineligible for nomination to the same office at the same election."

The law is void in that it requires the payment of certain fees as a condition precedent to becoming a candidate. (See section 7 of the act.) ·Under the provisions of article 2, section 1, and article 15, section 3, of the constitution, no property qualification is required, either of an elector or officer, and we think we may safely say the legislature cannot enact that an elector or officer must possess property qualifications before he can vote or hold office. If it cannot do this directly, it cannot do it indirectly, as it seeks to do when it requires the payment of money before one can seek office. Would it be argued that a law was valid which required the payment of five dollars by an elector before he could vote? Yet the right to be a candidate for office is as free and unlimited as the right to vote. It is false logic to say fees may be required if they are reasonable; the question of reasonableness is for the legislature, and it may prescribe fees which would be prohibitive when applied to minority parties. In fact this provision is in line with all other provisions of the law looking to the destruction of minority parties and the independent voter. As was well said in *Johnson* v. *Grand Forks County*, 113 N. W. 1071: "We are of the opinion that the legislature has no power to pass any law having for its purpose the restriction or limitation of the number of candidates who have otherwise qualified for office. If the fee as fixed is to stand, the practical working of the law is to discourage and possibly eliminate all party efforts, except on the part of the majority party. It is a practical prohibition on all voters of the minority party participating as members of such parties."

The law prohibits the nomination of "independent" candidates, and thus shows the legislative intent to confine participation in the primaries to parties having candidates at the last presidential election. It is true that the primary law,

sections 2 and 5, provides that nothing in this act shall prevent the nomination of independent candidates as provided by existing laws; still if the law provides an exclusive method whereby candidates' names may be placed on the ballot, and this method cannot be complied with by one seeking an independent nomination, is not the reservation thereby rendered nugatory?   The conditions to be complied with by candidates are as follows:

1. No candidate's name shall be printed on the official ballot to be used at a primary election unless nomination papers in form as prescribed be filed in his behalf. (Sec. 5, subd. 1.)

2. These nomination papers "shall be substantially" as set forth in the act, and "shall not be filed" unless in that form and signed and verified.   (Sec. 5, subd. 2.)

3. These nomination papers must be signed by a member of some party.   (Sec. 5, subd. 1.)

4. Nomination papers to the number of a certain percentage of the voters of the "party of such candidate" must be filed to entitle such candidate's name to be placed upon the primary ballot.   (Sec. 5, subd. 5.)

5. No other names may be printed on the official primary ballot.   (Sec. 12, subd. 1.)

6. The basis of the percentage above named is found in sec. 5, subd. 5, par. C.

7. The percentages of the party vote required are set forth in sec. 5, subd. 5, pars. A, B, C, D.

8. The candidate who may be nominated must be one who at the last preceding general election affiliated with the party on whose primary ballot he seeks to be placed.   (Sec. 5, subd. 4.)

9. The candidate must take oath as to the name of his party.   (Sec. 5, subd. 4.)

10. The official primary ballot must have printed upon it the "party designation."   (Sec. 12, subd. 3.)

11. A sample form of such ballot showing such party designation is made part of the act.   (Sec. 12, subd. 9.)

12. Upon the close of the primary election polls the election officers must "count all the votes cast for each party

candidate for the several offices, and record the same on separate tally-lists for each party." (Sec. 21, par. 2.)

We leave it to be explained how an independent candidate can comply with the above exclusive provisions of the law.

Any law which denies an elector his freedom of choice, his right of franchise, is absolutely void. Decisions on this point are so numerous and explicit that it stultifies one to argue the question as a *res nova.* We cite the following cases:

In *Sanner* v. *Patton*, 155 Ill. 563, the court said: "It is also said that ample provision has been made in this act whereby candidates may be nominated, and thus be entitled to have their names placed on the ticket, and that it is the intention of the act that no vote should be cast for a person who was not nominated. If such was the intention, why did the legislature not say so, and why did it say directly the contrary? What, it may be asked, is there so sacred in the nomination of a candidate for office by a political caucus that a voter should be compelled to vote for a nominee of the caucus or else be deprived of the elective franchise? Under section 1, article 7, of our constitution, every male citizen of the United States above the age of twenty-one years, who has resided in the state one year, in the county ninety days, and in the election district thirty days next preceding any election, is entitled to vote at such election. To exercise this right there is one exception, and but one, so far as we have been able to find; and that is found in section 7 of the same article, which declares that the general assembly shall pass laws excluding from the right of suffrage persons convicted of infamous crimes. Adopting the well-known maxim or rule of construction that the expression of one thing is to be regarded as the exclusion of another, the legislature does not possess the power to take away from a resident citizen the right of suffrage unless he has been convicted of an infamous crime. Nor can the legislature do indirectly what they cannot do directly, and yet, if the construction contended for by appellee be the correct one, the voter is deprived of the constitutional right of suffrage. He is deprived of the right of exercising his own choice, and when this right is taken away there is nothing left worthy of the name of the right of suffrage—the boasted free ballot becomes

a delusion.   By our constitution, general elections are to be held at certain fixed times, and the right of suffrage is secured to every citizen possessing the requisite qualification.   The new law cannot impinge upon the right of voters to select their public servants at such elections, or be so interpreted as to limit the range of choice for constitutional officers to persons nominated in the modes prescribed by it.   Nominations under it entitle the nominees to places upon the official ballots printed at public expense, but the Missouri voter is still at liberty to write on his ballot other names than those which may be printed there.   The statute recognizes this right by requiring blanks for such writing, next the printed names." (*Bowers* v. *Smith*, 17 S. E. 761.)

*R. C. Stoddard*, Attorney-General, for Respondent:

A careful consideration of appellant's brief will readily show that he depends almost entirely upon certain California cases wherein the supreme court of that state had under consideration statutes radically different from the one now under consideration in this case, which statutes were passed under constitutional provisions entirely unlike the Nevada constitutional provisions relating to elections.   Therefore it follows, under the familiar rule of constitutional law, that in the absence of such a limitation, the legislature has, under its police power, full and absolute authority to provide a method for the choosing of candidates for public offices.   Laws regulating primary elections of parties are the proper subject of police regulation.   (*State* v. *Moore*, 87 Minn. 308; *Ladd* v. *Holmes*, 40 Or. 167; *Hopper* v. *Stack*, 69 N. J. L. 562; *Kenneweg* v. *Commissions*, 102 Md. 119; *Bacon* v. *Walker*, 204 U. S. 311, 15 Cyc. 332.)   A primary election is not an election to public office.   It is merely a selection of candidates for office by the members of a political party, in a manner having a form of election.   (*Line* v. *Board of Canvassers*, 117 N. W. 730; *State* v. *Nichols*, 50 Wash. 508, 97 Pac. 728; *State* v. *Felton*, 77 Ohio St. 578.)   In *Montgomery* v. *Chelf*, 118 Ky. 766, 82 S. W. 388, it is also held that the constitutional provision that "all elections shall be free and equal" does not apply to primary elections.

By the Court, SWEENEY, J.:

The effect of this appellate proceeding is to test the constitutionality of the law commonly referred to and known as the "Direct Primary Law," enacted March 23, 1909. (Stats. 1909, p. 273.)   On the 23d day of February, 1910, the appellant herein, a taxpayer and qualified elector of the State of Nevada, instituted an action in the First Judicial District Court of the State of Nevada, in and for the County of Ormsby, against the respondent to restrain him from expending any money required to be expended or entering into any contracts required to be entered into under and by virtue of that certain law entitled "An act to provide for the direct nomination of candidates for public office by electors, political parties and organizations of electors, without conventions, at elections to be known and designated as primary elections, determining the tests and conditions upon which electors, political parties and organizations of electors may participate in any such primary election, and establishing the rates of compensation for primary election officers serving at such primary elections; providing for the organization of political parties and the promulgation of their platforms, and providing the methods whereby the electors of political parties may express their choice at such primary elections for United States senator, to provide for the registration of voters for said primary elections and the compensation of registry agents, and to provide penalties for violating the provisions of this act," assigning as grounds for the relief demanded constitutional defects in the law.   To the complaint, setting forth the unconstitutional grounds assigned, a demurrer was interposed by respondent, regularly presented to and sustained by the lower court and judgment rendered in favor of the defendant, respondent herein.   From this judgment plaintiff appeals, and attacks the law in question as unconstitutional upon the following grounds, which we will consider in the order presented:

"(1) The law is unconstitutional, in that it destroys political parties, and in so doing deprives voters of the right to form and govern political parties, which right inheres in the nature of our government and is guaranteed by the constitution of the State of Nevada.  (a) The law denies electors the right to

determine the political principles their candidates must espouse, and thus denies electors the right to instruct their representatives. (*b*) The primary law enables electors of opposite political faith to name the candidates of their political opponents.

"(2) The law is void, in that it denies certain political parties the right to participate in primary elections authorized by the act, and provides no method by which their candidates may appear upon the official ballot.

"(3) The law is void, in that it deprives political parties of the right to say who shall be members thereof, and forces each political party to admit as a member any elector who complies with the legislative test.

"(4) The law is void, in that it restricts the elector's right of suffrage contrary to the constitution, and denies him the privilege of voting for certain classes of electors.

"(5) The law is unconstitutional, in that it prevents one from being a candidate for office if he has been defeated at a primary election.

"(6) The law is void, in that it prohibits certain classes of electors, constitutionally qualified, from being candidates for office.

"(7) The law is void, in that it requires the payment of certain fees as a condition precedent to becoming a candidate.

"(8) The law is void, in that it requires of officers an oath other than and different from that required by the constitution.

"(9) The law prohibits the nomination of 'independent' candidates, and thus shows the legislative intent to confine participation in the primaries to parties having candidates at the last presidential election.

"(10) The law is unconstitutional, in this: It provides an exclusive method for obtaining a place on the official ballot, and further provides that only those whose names are on the ballot can be voted for, thus depriving electors of the right of suffrage."

Before proceeding, however, to a consideration of these objections raised, we believe it will be profitable to momentarily advert to a consideration of the limitations placed upon our lawmaking bodies in the enactment of laws by our

federal and state constitutions, and to the power of the judiciary to declare legislative action void, and to such rules of statutory construction as may be proper in the determination of the constitutionality of questioned legislative acts.

When the people of the United States created this unexcelled government of ours, they entertained the opinion that all power is inherent in the people, in opposition to the previous theory held by the royal heads of other governments, and commonly assented to, that the people were only entitled to such rights, privileges, and power as the heads of these governments deigned to give them. With a clear understanding of and faith in the principles that all men are created equal and all power is inherent in the people as contradistinguished from the principles entertained by monarchs and kings that royal blood made them superior to their fellow-beings, and that they were endowed with all governmental power by divine right, the people of the United States, before dispossessing themselves of any power they believed inherent in themselves and binding themselves up to a constitutional form of government, seriously debated and decided what governmental principles they would profess and imbed in their new constitution. They then divided and delegated specifically an enumerated list of powers to the legislative, executive, and judicial departments, into which they divided their new republican form of government, then an experiment, but now as a form of government a model and proven success, after which we believe in time all governments will be patterned.

To the Congress of the United States, the legislative branch of our national government, they plainly stated in their constitution what laws they are authorized to pass; and, as a consequence, Congress has no authority to pass any laws except such as the constitution either expressly authorizes or grants by clear implication. Hence, when a law of Congress is attacked as unconstitutional for contravening any right, unless the federal constitution granting Congress the specified authority to enact the measure is broad enough to sustain the law, it is unconstitutional. On the other hand, the people, formulating the constitution of our state, gave to the legislative

branch of our state government unreserved authority to pass
any legislation which was not expressly prohibited by the con-
stitution they framed or in violation of our national constitu-
tion.   Therefore, when a law of our state is attacked as uncon-
stitutional, it is presumed to be constitutional until it is
declared otherwise by a court of competent jurisdiction, as in
contravention of the constitution of the United States or that
our state constitution expressly prohibits the passage of the
act in question.   To sustain an act of Congress, we must
examine the constitution of the United States, and find a
grant of legislative power upholding the act as constitutional;
but to sustain an act of our legislature, alleged to be in con-
travention to our state constitution, we must examine our
state constitution, and find therein no prohibition of authority
to enact the measure before it can be declared unconstitu-
tional.   In short, in considering the constitutionality of a
federal or state act, there is a great difference in the legisla-
tive power conferred on Congress by the national constitution
and the power conferred on the legislature by our state con-
stitution to be considered, which must be kept in mind.   Con-
gress is authorized only to enact such laws as the national
constitution expressly grants it or is clearly implied with the
grant; while the lawmaking power of the state is authorized
to enact legislation on all subjects which are not expressly
prohibited by our state constitution or in contravention of the
federal constitution.

The Court of Appeals of the State of Missouri, in comment-
ing on this particular question, has the following to say: "But
a state legislature, unlike the national Congress, has full legis-
lative power wherever it is not restrained by the constitution,
whereas Congress has power only when it is granted by the
constitution.   Hence the legislature does not need express
constitutional authority to legislate on a subject, but only lack
of a constitutional prohibition.   'Authority' given by the
constitution to pass a law means, therefore, more than that
there is no restriction against passing a law.   It means a posi-
tive constitutional direction in regard to it.   It follows that
the constitution of the state does not authorize the passage of

an act regarding primary elections, although such an act of the legislature is valid, for it is not prohibited by the constitution." (*Dooley* v. *Jackson*, 104 Mo. App. 30, 78 S. W. 333.)

Judge Cooley, in his great work on Constitutional Limitations, states: "The rule of law upon this subject appears to be that, except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the state, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation within constitutional bounds is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil, but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the constitution. * * * Any legislative act which does not encroach upon the powers apportioned to the other departments of the government, being *prima facie* valid, must be enforced, unless restrictions upon the legislative authority can be pointed out in the constitution, and the case shown to come within them." (Cooley's Constitutional Limitations, 7th ed. 236–237.)

The Supreme Court of Pennsylvania tersely expresses the rule thus: "Nothing but a clear violation of the constitution—a clear usurpation of power prohibited—will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void." (*Pennsylvania Railroad Co.* v. *Ribelt*, 66 Pa. 169, 5 Am. Rep. 360.) Our own supreme court, in construing the legislative power of this state, held as follows: "That the legislature has the power to enact any law not prohibited by our constitution." (*State* v. *Arrington*, 18 Nev. 412.) It will be unnecessary to consume any time in considering all that has been said in the arguments and otherwise, as to the wisdom, policy, or expediency of the law in dispute, further than to say that this court has, in conformity with the incontrovertible law, held that as to these matters they are solely within the legislative department to determine, and for this

reason no legislative act is subject to judicial repeal. (*Ex Parte Boyce*, 27 Nev. 299, 65 L. R. A. 47; *Ex Parte Kair*, 28 Nev. 132–149, 113 Am. St. Rep. 817; Id., 28 Nev. 425–439.)

Our first consideration, therefore, in determining whether or not the present act is unconstitutional, will be an examination of our state constitution to ascertain if any prohibition exists therein which would deprive the legislature of the right to enact a direct primary law. Section 2 of article 1 of the constitution of Nevada provides: "All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people; and they have the right to alter or reform the same whenever the public good may require it. * * *" Thus we see the constitution expressly gives to the legislature the full power and authority to alter or reform the law whenever in their judgment the public good may require it. And, as before stated, as to the power, wisdom, or expediency of the law, these matters are entirely within the province of the legislative department.

Section 1 of article 2 of our constitution provides: "Every male citizen of the United States (not laboring under the disabilities named in this constitution), of the age of twenty-one years and upwards, who shall have actually, and not constructively, resided in the state six months, and in the district or county thirty days next preceding any election, shall be entitled to vote for all officers that now are or hereafter may be elected by the people, and upon all questions submitted to the electors at such election; *provided*, that no person who has been or may be convicted of treason or felony in any state or territory of the United States, unless restored to civil rights; and no person who, after arriving at the age of eighteen years, shall have voluntarily borne arms against the United States, or held civil or military office under the so-called Confederate States, or either of them, unless an amnesty be granted to such by the federal government; and no idiot or insane person shall be entitled to the privilege of an elector."

Section 6 of article 2 of our constitution provides: "Provision shall be made by law for the registration of the names of the electors within the counties of which they may be resi-

dents, and for the ascertainment, by proper proofs, of the persons who shall be entitled to the right of suffrage, as hereby established, to preserve the purity of elections and to regulate the manner of holding and making returns of the same; and the legislature shall have power to prescribe by law any other or further rules or oaths as may be deemed necessary, as a test of electoral qualifications." In these provisions of our constitution, we find full authority granted the legislature to pass all necessary legislation for general elections; and a further examination of our constitution will disclose no prohibition to enact a direct primary law so long as the act conforms in other respects to our constitution. As to the inherent right of the legislature under our constitution to enact a primary election law there can be no question.

Counsel for appellant have placed their main reliance for the nullification of this act upon three California cases, to wit, *Marsh* v. *Hanly*, 111 Cal. 371, 43 Pac. 975, *Spier* v. *Baker*, 120 Cal. 370, 52 Pac. 659, 41 L. R. A. 196, and *Britton* v. *Board of Commissioners*, 129 Cal. 337, 61 Pac. 1115, 51 L. R. A. 115, all of which cases were decided by the Supreme Court of California prior to an amendment of the constitution of that state specifically authorizing the enactment of a direct primary, and which we will have occasion to refer to and analyze during the course of this opinion. The constitution of California, however, prior to the amendment, was not identical with the constitution of Nevada, nor had it as broad or specific a grant of power as contained in section 6 of article 2 of our constitution, as a careful reading will reveal, and, in consequence, these authorities in this respect are of limited value in a determination of the constitutionality of the act in question.

Section 1 of article 2 of the constitution of California, under which these cases were decided, provides as follows: "Every native male citizen of the United States, every male citizen who shall have acquired the rights of citizenship under or by virtue of the treaty of Queretaro, and every male naturalized citizen thereof, who shall have become such ninety days prior to any election, of the age of twenty-one years, who shall have been a resident of the state one year next preceding the election, and of the county in which he claims his vote ninety

days, and in the election precinct thirty days, shall be entitled to vote at all elections which are now or may hereafter be authorized by law." The constitution was thereafter amended, as was stated by the Supreme Court of California, in *Katz* v. *Fitzgerald*, 152 Cal. 433, 93 Pac. 112, "to meet and avoid * * * objections to the primary law, which this court found were interposed by the constitution." The said section as amended, being 2½ of article 2 of the constitution of California, reads as follows:

"The legislature shall have the power to enact laws relative to the election of delegates to conventions of political parties; and the legislature shall enact laws providing for the direct nomination of candidates for public office, by electors, political parties or organizations of electors without conventions at elections to be known and designated as primary elections; also to determine the tests and conditions upon which electors, political parties or organizations of electors may participate in any such primary election. It shall also be lawful for the legislature to prescribe that any such primary elections shall be mandatory and obligatory. * * * "

The legislature of Nevada is authorized by direct constitutional authority (1) to make provision for the registration of electors; (2) to make provision as to who shall be entitled to vote; (3) to make provision to preserve the purity of elections; (4) the manner of holding elections; (5) the manner of making returns; (6) to prescribe any rule which may be deemed necessary as a test of electoral qualifications; the only limitation being that the legislature cannot violate section 1 of article 2, wherein the constitution in terms fixes who are entitled to the right of suffrage. While it is unnecessary for us to state whether or not the old constitution of California was broad enough to sustain a direct primary law, providing the act was in consonance in other respects with the constitution, without a grant of power for this specific legislation, as held necessary by the Supreme Court of California in these cases relied upon by appellant, yet an examination of section 2½ of the California constitution, as amended, will disclose that it is not much broader, if any, in its grant of power than is the power to enact a direct primary law given expressly to

the legislature of Nevada by section 6 of article 2 of our own constitution.

In *Socialist Party* v. *Uhl*, 155 Cal. 778, 103 Pac. 181, the Supreme Court of California sustained the right of the legislature of that state to enact a direct primary law under section $2\frac{1}{2}$ of the constitution of California. While the present law is a practical revolution of political methods, heretofore in vogue in this state, in the manner of selecting nominees for office, yet it is clear from an examination of our constitution that the legislature has the inherent and primal constitutional right to enact such a measure, providing it is in other respects not violative of other constitutional requirements. Having determined that our legislature is not prohibited from enacting, but, on the contrary, is vested with ample authority to pass a valid primary law, we come now to a consideration of whether or not the law, as enacted, is violative of any constitutional provision, as is contended by counsel for appellant.

1. It is urged by counsel for appellant that "the law is unconstitutional, in that it destroys political parties, and in so doing deprives voters of the right to form and govern political parties, which right inheres in the nature of our government and is guaranteed by the constitution of the State of Nevada." In support of this contention, counsel for appellant maintain that the "avowed object of the primary law is the destruction of political parties, for by its express terms it prevents them from nominating candidates or formulating platforms." With this contention we disagree, believing, on the contrary, that, when the legislature enacted the primary law in dispute, it recognized the existence of political parties, and that, instead of attempting to destroy them, it simply regulated the means by which the efforts of political parties should be directed and protected in exercising their preferences in nominating their party candidates. The primary law, from first to last, teems with recognition of political parties in its attempt to regulate the methods for the nomination of the candidates of the various parties. One of the main objects sought to be acquired by this law is to preserve the integrity of political parties. In the absence of any law by the legislature to regulate the nomination of candidates of the various parties or independent

candidates for office, political parties and candidates were privileged to adopt by custom or otherwise such methods as to them seemed best in getting on the official election ballot; but, when the lawmaking body of the state saw fit, for any reason or policy, to enact a measure promulgating a uniform method whereby candidates for nomination for the various offices or duly qualified electors who may desire to become candidates independently must comply with to get on the official ballot, methods or customs heretofore adopted by candidates for office or political parties in the selection of their candidates for office must give way to the law.

A proper administration of the affairs of a sovereign state affects vitally the welfare of the existence of its citizens, and, where such a matter of vital importance is at stake, the state has the right, under the police power vested in its legislature, to make such reasonable regulations in the interest of public welfare for the nomination of the candidates of the various parties as it may determine. (*State* v. *Moore*, 87 Minn. 308, 311, 92 N. W. 4, 59 L. R. A. 447, 94 Am. St. Rep. 702; *Ladd* v. *Holmes*, 40 Or. 167–180, 66 Pac. 714, 91 Am. St. Rep. 457; *Healey* v. *Wipf*, (S. D.) 117 N. W. 521–523 (1908); *State* v. *Michel*, 121 La. 374, 46 South. 430; *State* v. *Nichols*, 50 Wash. 508, 97 Pac. 728; *Walling* v. *Lansdon*, 15 Idaho, 282–300, 97 Pac. 396; *State* v. *Felton*, 77 Ohio St. 554, 84 N. E. 85; *People* v. *Dem. Com.*, 164 N. Y. 335, 58 N. E. 124, 51 L. R. A. 674; *State* v. *Anderson*, 118 N. W. 22; *State* v. *Johnson*, 87 Minn. 221, 91 N. W. 604, 840; *Morrow* v. *Wipf*, 115 N. W. 1121–1124; *Hopper* v. *Stock*, 69 N. J. Law, 562, 56 Atl. 1; *Kenneweg* v. *Commrs.*, 102 Md. 119, 62 Atl. 249; *State* v. *Anderson*, 100 Wis. 523–533, 76 N. W. 482, 42 L. R. A. 239; *De Walt* v. *Bartley*, 146 Pa. 529, 24 Atl. 185, 15 L. R. A. 771, 28 Am. St. Rep. 814; Cooley, Const. Lim. 7th ed., note p. 899; *State* v. *Moore*, 87 Minn. 308, 92 N. W. 4, 59 L. R. A. 447, 94 Am. St. Rep. 902; *Bacon* v. *Walker*, 204 U. S. 311, 27 Sup. Ct. 289, 51 L. Ed. 499, 15 Cyc. 332; *Dooley*-v. *Jackson*, 104 Mo. App. 21, 78 S. W. 330.)

Whether or not the state should attempt to regulate or change the methods heretofore in vogue in the way of nominating candidates for public offices, as heretofore suggested, is

a matter solely for the legislature to determine. The fact that twenty-two states in the Union have within the last twelve years seen fit to enact direct primary laws for the direct nomination of candidates for office and the right to enact such measures declared constitutional wherever such direct primary laws were not in violation of any other constitutional requirement, and the growing demand for a change of selecting nominees in other states which have not changed from the old convention methods to the direct primary methods, simply voices the evolutionary political spirit of the times in evidencing a desire for a political change which is believed to be for the best interests of the people and state. Nowhere in the primary law is there anything that prohibits the organization of political parties, associations, clubs, conventions, or organizations from convening as they have heretofore done and debating the policies of their party, drawing platforms, or in selecting candidates whom they will agree to support in a primary election if they desire to do so.

The Democratic party could, if it saw fit, issue a call for a convention as heretofore has been the custom, prepare platforms setting forth such principles as it may desire, and select and indorse whatever candidates it may desire to submit at the primary election. Such candidates selected, however, before they can become the nominees of their party, must submit to the voters of their party by direct vote to secure the proper certificates necessary to appear on the official ballot. Under the old convention method, the candidates selected became the party nominees, but under the primary law candidates for nomination must qualify before the rest of the voters of their party faith if they would be nominees of their party, unless they run independently.

One of the purposes of the direct primary law was undoubtedly to remove candidates from the influence of convention dictators or bosses or those who manipulate the selection of candidates by a superior knowledge of politics in convention by making such candidates so selected, should a convention be held anyway, be ratified by a majority of the voters of the particular party before they become party nominees. In other words, the voters may select their candidates directly; or can

either ratify the nominations of candidates nominated and recommended by a convention, should a convention be held, or in opposition to the convention candidates, if a convention should be held, reject such candidates if a majority of the voters of the party are not satisfied, or ratify as many of the nominations of such convention candidates as meet with the approval of a majority of the party. So it is plain that the purpose of the law is not to destroy political parties as contended, but rather to secure and preserve the right of the electors to select their own candidates if not satisfied with the candidates selected in a convention, were one had, for the purpose of the illustration suggested.

The objection of counsel for appellant that this law tends to destroy political parties is rather of a political than a legal objection, to which an appeal should be made to the people through the legislature to remedy, and not the courts. If the people do not like the law, the remedy is by an appeal to the legislature to repeal it rather than to the courts for judicial annulment. A careful consideration of the act in question leads us to believe that the voters, instead of being deprived of the right to govern political parties, as contended by counsel for appellant, are given greater power to govern them, for the reason that the majority of the electors of any party have the power retained in themselves to override any candidate or group of candidates selected by convention or otherwise if they do not meet with the approval of the electors.

Counsel for appellant assume in support of their objection to the act under consideration that the law deprives the electors, when collectively associated in a party, of electoral rights guaranteed them under the constitution of Nevada, because of the importance played by national parties in forming the policies and shaping the history and destinies of our government from the time of its inception, in that no law can vary the convention custom of selecting candidates and formulating platforms which have been in vogue so long, for the reason that these customs have been practically crystallized into law. No one, with any knowledge of the history of our country, will contend for a moment that political parties have not played an important part in both the political and economic history

of our government; nor that they are not a powerful and necessary force in a successful administration of the affairs in a republican form of government such as we possess.

As was succinctly said by Mr. Bryce in the American Commonwealth: "In America the great moving forces are the parties. * * * The spirit and force of party has in America been as essential to the action of the machinery of government as steam is to a locomotive engine; or, to vary the simile, party association and organization are to the organs of government almost what the motor nerves are to the muscles, sinews, and bones of the human body. They transmit the motive power. They determine the directions in which the organs act. A description of them is therefore a necessary complement to an account of the constitution and government; for it is into the hands of the parties that the working of the government has fallen. Their ingenuity, stimulated by incessant rivalry, has turned many provisions of the constitution to unforeseen uses, and given to the legal institutions of the country no small part of their present color." (*State* v. *Felton*, 77 Ohio St. 569, 84 N. E. 87.) But political parties, which are organizations of electors, entertaining the same political opinions, attempting through an organization to elect officers of their own party faith, and make their political doctrines the policy of the government, can have no greater rights than any elector, notwithstanding the important part political parties have played in our history, and their customs of selecting candidates must give way to the law when the legislature so decides.

Counsel for appellant fail to appreciate the fact that the elective franchise guaranteed to the electors under the constitution of the state is a mere political privilege, not a natural right nor an inherent unqualified personal or political right, and, in consequence, it naturally follows that the rights of political parties are no greater than the rights of the electors derived from the constitution. (6 Am. & Eng. Ency. Law, p. 935; Bryce, Am. Commonwealth, pp. 422, 423; *Weimer* v. *Bunbury*, 30 Mich. 214; 8 Cyc. 743; Cooley, Const. Lim. 7th ed, pp. 244, 245; *Beebe* v. *State*, 6 Ind. 501–510, 63 Am. Dec. 391; *Mayo* v. *Wilson*, 1 N. H. 53; *Hale* v. *Everett*, 53 N. H. 9, 16 Am.

Rep. 82; *Eckerson* v. *Des Moines*, 137 Iowa, 452, 115 N. W. 177; *Healey* v. *Wipf*, 117 N. W. 521; *Coggeshall* v. *Des Moines*, 138 Iowa, 730, 117 N. W. 309, 128 Am. St. Rep. 221; *Gougar* v. *Timberlake*, 148 Ind. 38, 46 N. E. 339, 37 L. R. A. 644, 62 Am. St. Rep. 487.)

Counsel contends that because section 2 of article 1 of our constitution, which sets forth that "all power is inherent in the people," and that section 20 of article 1, wherein it says, after enumerating the rights retained by the people, that "this enumeration of rights shall not be construed to impair or deny others retained by the people," therefore political parties are deprived of the rights to select candidates for office as was the custom at the time the constitution of the state went into force and effect. The fallacy of the argument is apparent, in view of the right which is still retained in the people as illustrated by the fact that they have the right to either ratify or reject the candidates of the convention or any clique of politicians who may attempt to force a nominee upon them before obtaining their approval and consent. It is obvious that the very retained political spirit claimed as inherent in the people still exists and the enactment of a primary law does not, when analyzed, deprive them of any right political or otherwise which they heretofore enjoyed.

(a) The next constitutional objection interposed by counsel for appellant is that "the law denies electors the right to determine the political principles their candidates must espouse, and thus denies electors the right to instruct their representatives," because it is in violation of section 10 of article 1 of the constitution, which provides: "The people shall have the right freely to assemble together to consult for the common good, to instruct their representatives, and to petition the legislature for redress of grievances." This argument has been shown to be untenable by what we have stated in our previous treatment of the assignment just passed upon, and our illustration of how parties, if they wish, may still under this law assemble and formulate platforms and instruct any candidates they may endorse for submission to the party at the primary election.

As previously stated, there is nothing in the law which

denies the right of the various parties to assemble in convention or otherwise and consult together, nor is there anything in the law wherein the various ·parties are precluded from instructing the candidates whom they may select as candidates for the primary either before or after their nomination. The constitutional privilege guaranteed to the people to assemble together and instruct their representatives is in no way abridged by this law, nor are they precluded from doing so under this law the same as they have in the past under convention methods heretofore in vogue if they so desire. While all candidates, even in conventions, were bound by all political morals to carry out the planks in their respective platforms to which they pledged themselves when nominated, yet there is no law or constitutional mandate requiring them to do so. We believe there is a great constitutional distinction which counsel for appellant seemingly overlook when they contend that an antecedent pledge, as required under the old convention method of making the candidates endorse the platforms before they were nominated, is the same as the constitutional right vested in the people to "instruct their representatives." Neither under the old law nor under the primary law could the people be precluded from assembling and instructing candidates as to their wishes or principles or the policies they desired said candidates to support. Certainly there is nothing in the present law which would preclude them from assembling to instruct an independent candidate if he were elected any less than there has been in the past to assemble and instruct independent candidates prior to the enactment of the primary law. The people still retain the power to so assemble and instruct either independent or regular party candidates, or not, as they so desire, and the candidates elected have still the great American privilege of executing their instructions or declining to do so.

(b) The next objection of counsel for appellant is that "the primary law enables electors of opposite political faith to name the candidates of their political opponents." This we believe is an assumption of counsel which in no way affects the constitutionality or unconstitutionality of the law in question. Counsel for appellant in this contention, as in many others attacking this law, fail to grasp the distinction between the unrestricted

right of the legislature to regulate primary elections of political parties for the election of their nominees at primary elections, and the limitations imposed on the legislature in enacting laws affecting elections for the selection of the officers by the entire electorate, as distinguished from the voters qualified to vote for party nominees.   There is a substantial distinction in the law between the nominating of a candidate and the election of a public officer.   The promise of an elector to comply with the test prescribed by law before he is allowed to vote at a primary election cannot invalidate the law because of the individual betrayal of the test after he has voted.   The legislature has the unquestioned right to prescribe a uniform test for electors who desire to participate in primary elections.   The test provided in the present law "as to his bona fide present intention to support the nominees of such political party or organization," is a reasonable and fair regulation in maintaining the integrity of the various parties, and we can see no valid objection in requiring those who participated in a primary election from stating that they intend to support the candidates named by them for election.   Under the old political system in vogue at primary elections for the selection of delegates to convention, tests have always been required of every elector challenged who desired to participate in the election.

The Supreme Court of Louisiana, in sustaining the test required by the primary law in that state, said: "* * * The voter, by participating in a primary, impliedly promises and binds himself in honor to support the nominee, and that a statute which exacts from him an express promise to that effect adds nothing to his moral obligation, and does not undertake to add anything to his legal obligation.   The man who cannot be held by a promise which he knows he has impliedly given will not be held by an express promise." (*State* v. *Michel*, 121 La. 387, 46 South. 434.)

The Supreme Court of the State of Washington, in upholding the test required in that state for those participating in primary elections, said: "Section 12 of the primary act (Laws 1907, c. 209) provides that when a voter at the primary election demands the ticket of a particular party, and his right to vote that ticket is challenged, he shall make oath or affirma-

tion that he intends to affiliate with the party whose ballot he demands at the ensuing election, and that he intends to support generally the candidates of that party.    It is contended that this section adds a requirement to the qualifications of electors in addition to the constitutional requirements, and for that reason renders the entire act void.    Were the primary election so far such an essential part of the general election as to make the constitutional provision relating to the qualification of electors entitled to vote at the general election applicable thereto, then there would be force in this objection.    But we do not think the sections of the constitution providing the qualifications of electors applicable to the primary election provided for by this statute.    It is not the purpose of the primary election law to elect officers.    The purpose is to select candidates for office, to be voted for at the general election.    Being so, the qualifications of electors provided by the constitution for the general election can have no application thereto. *   *   *    No doubt the qualification here complained of was inserted to protect the integrity of political parties.    The legislature had provided for party ballots for use at the primary election, and it was but just that some restraint be put upon the privilege of demanding and voting a particular ballot.    So far, therefore, from being an unwarranted restriction, it seems to us that, if party integrity is to be preserved, this provision is highly proper and commendable, and could have been made with profit much more stringent than it actually is."    (*State* v. *Nichols*, 50 Wash. 522, 97 Pac. 731.)

The Supreme Court of South Dakota, in sustaining the right of the legislature to prescribe a test for candidates of the various political affiliations at primary elections, said:    "It is for the party to nominate; for the people to elect.    The question is not who shall be chosen to any particular public office. That is for the voters of all political parties to determine at the polls.    It is simply who shall represent the organization as its nominees, and certainly the determination of that question should be controlled by the action of the party itself; otherwise, party nominations are impossible.    To what extent, if at all, the rights of organized political parties should be recognized and regulated by law, is a matter of public policy, to be deter-

mined by the legislative department—a matter which does not concern this court. Its duty is done when it gives effect to the legislative will as expressed in statutes which do not conflict with any provision of the federal or state constitution. (*State* v. *Metcalf*, 18 S. D. 393, 100 N. W. 923, 67 L. R. A.)" (*Morrow* v. *Wipf*, 115 N. W. 1124.)

The Supreme Court of the State of Oregon, in sustaining the view we entertain, that the legislature is authorized to regulate the test of political organizations at a primary election, in passing upon this point, said: "The test prescribed for participating in a party primary is that the elector 'voted for a majority of the candidates of such party or association at the last election, or intends to do so at the next election.' The authority of the legislature to prescribe any test whatever is challenged; that being a matter, it is contended, wholly within the discretion of the parties themselves. The California primary act of 1899 was declared inoperative because it prescribed no test whatever, and permitted parties of different party affiliations to vote for party delegates. (*Britton* v. *Board*, 129 Cal. 337, 61 Pac. 1115, 51 L. R. A. 115.) Hence it would seem that a test is necessary. But who shall prescribe it? Neither the legislature nor the parties can prescribe any test, it is plain, that will operate to exclude legal voters of the same political faith, nor admit any that are not legally qualified, as otherwise the election would not be free and equal. The election being authorized by law, parties cannot claim any higher authority touching the qualifications of voters thereat than the legislature. If so, they might easily subvert the will of the legislature, and render the law nugatory for any substantial purpose. So the question recurs as to whether this feature is one of regulation also. We think it is, and within the power of the legislature to prescribe the rules relative thereto under the constitution. The fundamental principle upon which such legislative authority proceeds, and must proceed, is that its ultimate purpose is the election of public officers by a free and equal choice of the qualified electors. A free and equal choice of such officers includes a free and equal choice by party members of the delegates whose function it becomes to select partisan candidates, and the legislative authority is

adequate to prescribe all reasonable rules and regulations looking to the security and safeguarding of these sacred rights and privileges. In so doing the right of the adherents of the respective parties to assemble and consult together for their common good is in no way impinged upon, and they may still advocate and promulgate political doctrines and principles without restriction, so that it is done in a peaceable manner, and does not tend to moral obliquity, the infraction of the law (*Davis* v. *Beason*, 133 U. S. 333, 10 Sup. Ct. 299, 33 L. Ed. 637), or the destruction of the government itself. In so far as *Britton* v. *Board*, 129 Cal. 337, 61 Pac. 1115, 51 L. R. A. 115, is not in harmony with this view, if it may be considered, we cannot approve it." (*Ladd* v. *Holmes*, 40 Or. 167, 188, 66 Pac. 714, 721, 91 Am. St. Rep. 457.)

Counsel for appellant seemingly fail to appreciate that the electoral test of an elector spoken of in the constitution is for the election of public officers, and not for the-election at which party nominees are selected. The Supreme Court of California, in the recent case of *Socialist Party* v. *Uhl*, said: "The right and duty of the legislature to prescribe a test for electors voting at a primary cannot be questioned, nor do we perceive any reasonable grounds for questioning the validity of a test as to candidates." (*Socialist Party* v. *Uhl*, 155 Cal. 776, 792, 103 Pac. 188.) Any reasonable test of party affiliation may be required by the legislature of those who desire to participate in primary elections of the various parties. (*State* v. *Nichols*, 50 Wash. 508, 97 Pac. 728; *State* v. *Michel*, 121 La. 374, 46 South. 430; *State* v. *Drexel*, 74 Neb. 776, 105 N. W. 174; *Hopper* v. *Stack*, 69 N. J. Law, 562, 56 Atl. 1; *Morrow* v. *Wipf*, 115 N. W. 1121; *Rouse* v. *Thompson*, 228 Ill. 522, 81 N. E. 1109.) The test prescribed by our statute is practically identical with the test prescribed under the primary act of the State of New York (Laws 1899, c. 473), sustained by the New York Court of Appeals speaking through Judge Alton B. Parker, in *People* v. *Democratic Comm.*, 164 N. Y. 335, 58 N. E. 124, 51 L. R. A. 674.

2. It is also contended by counsel for appellant that "the law is void, in that it denies certain political parties the right to participate in primary elections authorized by the act, and provides no method by which their candidates may appear

upon the official ballot." Again, we find the position of counsel fallacious in failing to keep in mind the substantial distinction which exists between a primary election, which is an election simply for the nomination of candidates of the various parties, and the election of public officers when the voters of all parties at the polls determine from among the candidates selected at the primary elections and independent candidates who are to be the officers to administer their affairs of state.   A primary election at which nominees of the various parties are selected is not to be confounded with the election of officers within the meaning of the constitutional right of electors "to vote for all officers that are now or hereafter may be elected by the people." (*Line* v. *Board*, 154 Mich. 329, 117 N. W. 730, 18 L. R. A. 412; *Montgomery* v. *Chelf*, 118 Ky. 766, 82 S. W. 388; *Morrow* v. *Wipf*, 115 N. W. 1121–1124; *State* v. *Johnson*, 87 Minn. 221, 91 N. W. 604, 840; *State* v. *Nichols*, 50 Wash. 508, 97 Pac. 728; *State* v. *Felton*, 77 Ohio St. 554–578, 84 N. E. 85; *Dooley* v. *Jackson*, 104 Mo. App. 21, 78 S. W. 330.)

As tersely stated by the Supreme Court of the State of South Dakota:   "It is for the party to nominate; for the people to elect." (*Morrow* v. *Wipf*, 115 N. W. 1124.)

The Supreme Court of Minnesota, in considering the constitutional provision similar to our own, said: "If the election of candidates to the position of nominees is an election within the meaning of article 7 of the constitution, then the primary law, as above construed, is unconstitutional. It would in certain cases deprive the voter of his privilege to exercise the elective franchise.   Such an occasion might arise when no candidates appear for nomination, no provision being made for filling vacancies or for leaving blank lines on the ballot to enable the voter to write in the name of some person of his choice.   But it is very clear that the election of nominees provided for in the primary law is not the election referred to in the constitution.   The language of article 7 bearing upon the subject is as follows:   'Every male person of the age of twenty-one years or upwards, belonging to either of the following classes, who shall have resided in the United States one year and in this state four months next preceding any election shall be entitled to vote at such election in the elec-

tion district of which he shall at the time have been for ten days a resident for all officers that now are or hereafter may be elective by the people.' By 'officers' is meant the executive or administrative agents of the state or the governmental subdivisions thereof, and the election mentioned has reference only to the selection of persons to fill such offices. The election thus defined cannot reasonably be given so broad an interpretation as to include the selection of nominees for such offices." (State, ex rel. Gulden, v. Johnson, 87 Minn. 223–224, 91 N. W. 841.)

The legislature has the undoubted right, in the regulation of primary elections, to prescribe qualifying classifications for political parties who desire to avail themselves of the privilege of getting on the official ballot through the manner prescribed by law.

The Supreme Court of California, in the case of Katz v. Fitzgerald, in opposition to the contention made by counsel in this assignment, wherein the same question was directly presented, held that it was a reasonable regulation for the legislature to classify such political parties then in existence as a right to appear otherwise than independently by limiting their right to a certain percentage of the votes cast at a previous election, and not a denial of any constitutional right so long as the law is uniform in providing what parties could avail themselves of the primary methods of selecting their nominees for office.. "Some classification is made necessary, else any two, three, or four men might call themselves a party, and impose the burden of placing the names of their candidates upon the ballot provided by the state law—a condition which could be easily made intolerable to the state, as well as to the voter. Classification becoming necessary, the one here adopted is rational, and does not impose any burden upon one of a class that is not imposed upon all; nor, upon the other hand, does it confer any special privilege upon parties which have cast more than three per cent of the vote, which is not conferred upon all such parties." (Katz v. Fitzgerald, 152 Cal. 433, 93 Pac. 114.)

In Ladd v. Holmes, supra, the Supreme Court of the State

of Oregon has also held that the position of counsel on this point is not tenable.

The Supreme Court of Minnesota, in the case of *State* v. *Jensen*, 86 Minn. 19, 89 N. W. 1126, in commenting on this point, said: "We are of the opinion that the legislature may classify political parties with reference to differences in party conditions and numerical strength, and prescribe how each class shall select its candidates, but it cannot do so arbitrarily, and confer upon one class important privileges and partisan advantages and deny them to another class, and hamper it with unfair and unnecessary burdens and restrictions in the selection of its candidates. While it seems to some of us that the percentage of the vote selected as the basis of the classification in this act is larger than necessary, yet it was a question for the legislature, and we are not justified in holding that the classification was arbitrary. We hold the law as we have construed it constitutional." See, also, 15 Cyc. 334; *Schafer* v. *Whipple*, 25 Colo. 400, 55 Pac. 180; *People, ex rel. Dickerson*, v. *Williamson*, 185 Ill. 106, 56 N. E. 1127; *State* v. *Kinney*, 57 Ohio St. 221, 48 N. E. 942; *Corcoran* v. *Bennett*, 20 R. I. 6, 36 Atl. 1122; *Davidson* v. *Hanson*, 87 Minn. 211, 91 N. W. 1124, 92 N. W. 93; *Ransom* v. *Black*, 54 N. J. Law, 446, 24 Atl. 1021, 16 L. R. A. 769; *State* v. *Poston*, 58 Ohio St. 621, 51 N. E. 150, 42 L. R. A. 237; *De Walt* v. *Bartley*, 146 Pa. 529, 24 Atl. 185, 15 L. R. A. 771, 28 Am. St. Rep. 814.

The answer to the contention of counsel for appellant that the law is constitutionally defective, in that no method is provided by which candidates of other parties other than those particularly designated by the act may appear upon the official ballot is that such parties or those disqualified may avail themselves of subdivision "c" of section 5, which among other things provides: "Nothing herein shall be construed as prohibiting the independent nomination of candidates to be voted for at any general election, by electors or bodies of electors, as now provided by law.   *   *   *"   (Stats. 1909, p. 278.) Section 1693, *et seq.*, Comp. Laws, which are not repealed by the primary law and are now in full force and effect, prescribe a method by which independent candidates or new parties

may avail themselves by petition in getting on the official ballot. The present law is uniform in so far as it treats the various classes of electors who may desire to get on the official ballot, and if candidates or political parties do not wish to avail themselves of the privilege accorded them of securing their nominations as now provided by the primary law, or by reason of not being able to qualify with the legislative requirements imposed, they still have the constitutional privilege of running independently.

3. Counsel for appellant also contends that "the law is void, in that it deprives political parties of the right to say who shall be members thereof, and forces each political party to admit as a member any elector who complies with the legislative test." The right of the legislature to prescribe a test for party organizations who may desire to comply with the direct primary methods provided for the selection of their candidates we believe is thoroughly established. If, as heretofore expressed in this opinion, one of the obvious purposes of the primary law is to preserve the integrity of parties, it is manifestly proper for the legislature to impose a test on those who may desire to participate in the primary election for the selection of candidates in order that the integrity of the party may be better sustained. The test required by the law in question is a reasonable one. Even without the test, an elector is in political honor bound to support the nominee whom his vote aids in becoming the party nominee. The oath merely acts as a guaranty and an additional incentive to carry out the obligations which every man participating in a primary election morally assumes whether he takes the test or not.

The Supreme Court of California, in the case of *Socialist Party* v. *Uhl*, *supra*, and also in the case of *People* v. *Griffith*, held a similar objection to that now raised by counsel for appellant as untenable in primary law cases wherein this identical question was squarely raised and passed upon. (*Socialist Party* v. *Uhl*, 155 Cal. 792, 103 Pac. 181; *People* v. *Griffith*, 146 Cal. 339, 80 Pac. 68.)

4. Counsel for appellant further assigns that "the law is void, in that it restricts the elector's right of suffrage contrary to the constitution, and denies him the privilege of voting for

certain classes of electors," in violation of section 1 of article 2
of the constitution of the state, which section prescribes the
qualifications of electors.   An examination of section 1 of
article 2 of our constitution will reveal that the constitutional
right of suffrage of those made qualified to vote is that "they
shall be entitled to vote for all officers that are now or here-
after may be elected by the people." With this test in mind,
and keeping in view the substantial distinction that a primary
election, at which the choice of candidates or nominees of
political parties are selected, as distinguished from the general
election in November wherein the entire electorate elect the
officers, provided for in the test, the fallacy of this point
assigned by counsel is too apparent after what has been here-
tofore said to need further review or consideration.

That a primary election of candidates is not an election of
officers within the meaning of the constitutional test has been
sustained by an overwhelming weight of authority in states
with similar constitutional provisions to those contained in
the constitution of Nevada.   (*Line* v. *Board*, 154 Mich. 329,
117 N. W. 730, 18 L. R. A. 412; *Morrow* v. *Wipf*, 115 N. W.
1121–1124; *Montgomery* v. *Chelf*, 118 Ky. 766, 82 S. W. 388;
*State* v. *Johnson*, 87 Minn. 221, 91 N. W. 604, 840; *State* v.
*Nichols*, 50 Wash. 508, 97 Pac. 728; *State* v. *Felton*, 77 Ohio St.
554–578, 84 N. E. 85; *Dooley* v. *Jackson*, 104 Mo. App. 21;
78 S. W. 333.)

The law is not mandatory in compelling candidates who
may desire to get on the official ballot to submit themselves to
the primary election.   They have the privilege, as heretofore
stated, of running independently if they desire.   In the event
they desire to submit themselves to the primary election, it is
not unreasonable or unrighteous to make them comply with
any reasonable test made by the legislature for the purpose of
preserving the integrity of the party with which they desire to
affiliate.   Nor do we see anything unreasonable or unright-
eous in limiting a man who desires to vote to cast his ballot for
but one candidate for each office.   This is also a salutary reg-
ulation in preserving the integrity of political parties.   If,
after the primary is over, an elector who has participated in
the primary changes his mind and desires to vote for some

other candidate named by some other party or for an independent candidate, there is nothing in the primary law to preclude him from so expressing his choice at the general election. This is the only constitutional right which he is guaranteed by the constitution of the state, in so far as his privilege of expressing his right to designate the various officers who are to administer the affairs of state is concerned.

Further answering this assignment of appellant, we advert to the admission of counsel for appellant on pages 38 and 39 of his brief, wherein it is said: "It may be admitted that the legislature might require a certain qualification for office if the qualification applies to all electors alike. A qualification for office is something that fits one for office, something all electors must comply with before becoming a candidate." This the act without question does. This admission of counsel tersely expresses the law on this point. It will not be questioned that the legislature has the right to add qualifications to electors desiring to become candidates for specified offices, so long as the added qualifications are reasonable, and not violative of any constitutional provision.

Laws have been enacted by legislatures and have been sustained on innumerable occasions wherein qualified electors have been required to qualify before becoming qualified candidates for the various offices throughout the state of being property holders or of having some especial qualification for such offices. Of course, the legislature has no authority to add qualifications to candidates for federal offices created under the federal constitution, where that instrument has defined the qualifications of such officers. In the consideration of this error assigned, as in other assignments to follow, the distinction between the right to vote and the right to hold office must not be confounded or lost sight of. An elector may be constitutionally qualified to vote and yet be legislatively debarred from becoming a candidate for some official position within the state.

5. It is also contended by counsel for appellant that "the law is unconstitutional, in that it prevents one from being a candidate for office if he has been defeated at a primary election." The Supreme Court of California, in the recent case

of *Socialist Party* v. *Uhl*, in disposing of this objection raised by a petitioner of the same standing as the one at bar, expresses our views in the following language: "The act further provides that a candidate defeated at a primary election shall be ineligible for nomination to the same office at the same election. It is insisted that this provision is void. The determination of this question may be properly reserved to a case when it arises. It is sufficient here to say that if this provision be void this fact would not operate to invalidate the remainder of the law." (*Socialist Party* v. *Uhl*, 155 Cal. 794, 103 Pac. 189.)

We do not deem it necessary to further consider this point other than to say that it will be ample time for this court to consider this point when some appellant whose right is affected by this provision comes before the court in a proper proceeding. In view of the fact that, if the section covering this provision were declared void, it would not affect the remainder of the law, it renders it unnecessary for us to give this point further consideration.

6. The further contention is made by counsel for appellant that "the law is void, in that it prohibits certain classes of electors constitutionally qualified from being candidates for office." In alleging the law to be void upon this assignment of error, counsel for appellant fail to appreciate the distinction between the constitutional requirement of an elector and the constitutional qualification of a candidate to be voted for as an officer at the general election. The constitution defines the qualifications of an elector, but the legislature may prescribe reasonable qualifications for an elector who may desire to become a candidate, providing such qualifications are not in conflict with some constitutional provisions. The qualifications required by the primary law are not, as we view the constitution, violative of any such requirement. While citizenship, age, sex, and residence enter into the qualifications made necessary by the constitution to make a legal voter, yet, in addition to these, other qualifications are essential to the efficient performance of discharging the duties connected with almost every office; and these additional qualifications the legislature is privileged to impose so long as they do not con-

flict with any constitutional requirements.    For instance, for
certain offices qualifications are imposed by the legislature that
electors, before they may become candidates for such offices,
must qualify by being taxpayers or by having some qualifica-
tion of ability to discharge the peculiar functions of a partic-
ular office.

These additional qualifications imposed have been sustained
on innumerable occasions as no violation of the constitution.
The cases are innumerable where qualifications not possessed
by all electors are required of candidates for office.    The
framers of the constitution of our state did not intend, when
they enumerated the qualifications of every elector, to make
those qualifications the test of the eligibility of the various
civil officers throughout the state, and, except in so far as the
constitution has expressly provided the qualifications of the
various officers, the legislature has the unquestioned right to
add additional qualifications.    (*Darrow* v. *People ex rel. Norris*,
8 Colo. 417, 8 Pac. 661.)

Chief Justice Beatty of the Supreme Court of California, in
the case of *Shostag* v. *Cator*, in treating an objection adversely
to the contentions of counsel for appellant, in that the law is
unconstitutional for the reasons set forth in this assignment,
very appropriately said: "These views, if correct, dispose of
several other objections urged by petitioner, and relieve us of
the necessity of taking them up *seriatim*.    We shall, however,
notice some of the arguments that have been most strongly
urged upon our attention.    It is contended that the test pre-
scribed by section 1366a is unreasonable, because, with the
close of registration, the elector loses his right to change his
party allegiance in consequence of a change in political con-
victions, and is precluded from taking part in the election of
delegates at the convention of the party with which on the
day of the election his more matured opinions would impel
him to cast in his lot.    This inconvenience certainly does
result from the provisions of the act, but the legislature,
which must be presumed to have foreseen it, probably regarded
such sudden conversions during the short interval between
the close of registration and the date of the primary election
as likely to be of such rare occurrence as not to justify the

omission of a provision evidently designed to prevent unscrupulous and mercenary electors from holding themselves free down to the day of election to vote with any party, upon any corrupt motive, for the purpose of influencing the nomination of its candidates for public office, while without any interest in their success, and perhaps with an interest in their defeat. If it shall sometimes happen that a conscientious voter is converted from one political faith to another between the close of registration and the primary election, he may console himself for the loss of his vote by the reflection that his loss is trifling in comparison to his share of the advantage to the state of which he is a citizen, flowing from a measure which tends to prevent a grave abuse, especially in those centers of population where the primary election law is made obligatory. Another inconvenience suggested by the fact that in the City and County of San Francisco one political party entitled to participate in the primary election has determined not to hold a convention or nominate candidates is that the members of that party in this instance, and the members of all parties in similar cases hereafter, will be deprived of the right to vote at the ensuing primary. This inconvenience does not seem to afford valid ground of complaint, since it amounts only to this: That the members of a party which holds no primary election are merely prevented from interfering in the management of a party to which they do not profess to belong." (*Shostag* v. *Cator*, 151 Cal. 604, 605, 91 Pac. 503, 504.)

7.  The further contention is made by counsel for appellant that "the law is void, in that it requires the payment of certain fees as a condition precedent to becoming a candidate." There is no merit in this contention, in view of the fact that the fee exacted is not an unreasonable one and within the discretion of the legislature to impose upon candidates who may desire to avail themselves of the benefit of the act. The right of the legislature to exact a reasonable fee from candidates for office has been sustained in practically every state where a primary law exists, upon the same principle that fees in actions at law and proceedings in courts and for the filing and recording of documents are sustained. These cases maintain the right of the legislature to exact fees, upon the theory that those

who seek the benefit of a particular proceeding provided by law should be compelled to reimburse the state for at least a portion of the expense which the state incurs in maintaining the means whereby they accomplish their desires. (*State* v. *Scott*, 99 Minn. 145, 108 N. W. 828; *Kenneweg* v. *Commrs.*, 102 Md. 119, 62 Atl. 249; *State* v. *Nichols*, 50 Wash. 508, 97 Pac. 728; *Socialist Party* v. *Uhl*, 155 Cal. 790, 103 Pac. 181.)

8. Counsel for appellant further assigns the "law is void, in that it requires of officers an oath other than and different from that required by the constitution." This contention is also devoid of merit, in that the oath required by the constitution is an oath an officer is required to take when he is about to enter office, as distinguished from the primary election oath, which is one of fealty to a party, as a candidate for office, and is not regulated or imposed by the constitution. As before stated in this opinion, a primary election is not an election in the constitutional sense of an election of officers, but merely an election of parties to select nominees to run for office.

Section 2 of article 15 of the constitution of Nevada provides: "Members of the legislature and all officers, executive, judicial, and ministerial, shall, before they enter upon the duties of their respective offices, take and subscribe to the following oath or affirmation: [The oath being set forth]." A reading of this section discloses that the constitution does not preclude the legislature from providing an additional oath for candidates at primary elections. (*Socialist Party* v. *Uhl*, 155 Cal. 790, 103 Pac. 181; *State* v. *Nichols*, 50 Wash. 508, 97 Pac. 728.)

The case of the *State* v. *Findlay*, 20 Nev. 198, 19 Am. St. Rep. 346, cited by counsel for appellant, is in no way applicable to the test required in this primary law. In that case this court very properly held that an act which attempted to prescribe the qualifications of an elector by prohibiting Mormons from voting and requiring applicants for registration to take an oath that they were not members of the Mormon Church was a direct violation of section 1 of article 2 of the constitution of our state, as well as violative of the federal constitution. Unquestionably no religious test in this country

can be made a qualification of an elector in the exercise of his right of suffrage. The oath required by the primary law is a reasonable one, and in no way violates any of the provisions of the constitutions, federal or state.

9. The next point raised by counsel for appellant is that "the law prohibits the nomination of 'Independent' candidates, and thus shows the legislative intent to confine participation in the primaries to parties having candidates at the last presidential election." This contention is also devoid of merit. The primary law expressly preserves the existing law (section 1693, *et seq.*, Comp. Laws Nev.), wherein independent candidates and parties who may not be able to qualify or avail themselves of the primary law may get on the official ballot by independent action. Nowhere in the law are independent candidates prohibited from being voted for at the general election. We believe this assignment has been so thoroughly covered in previous parts of this opinion in answer to other objections raised that is undeserving of further comment.

We come now to a consideration of the fifty-seventh and last objection interposed by counsel for appellant to the validity of the act in question, setting forth that "the law is unconstitutional, in this: It provides an exclusive method for obtaining a place on the official ballot, and further provides that only those whose names are on the ballot can be voted for, thus depriving electors of the right of suffrage." This assignment of error has more or less been touched upon in its various aspects during the course of this opinion. Unquestionably the legislature has not the right to preclude any qualified elector who may be qualified as a candidate under the constitution and laws of the state from being a candidate for office. The contention of counsel for appellant that the legislature cannot preclude an elector from voting for any qualified elector for any office for which such elector is constitutionally qualified is not involved in the present case, which relates only to primary elections.

We have stated in this opinion that all those candidates who may be disqualified from participating in the right to go on the official ballot by reason of coming of voting age since the last election or otherwise through the primary election, as

provided by this act, are legally privileged and entitled to run independently to the same extent as they were prior to the passage of this law under the provisions of the old law regarding the rights and election of independent candidates, which is not repealed, and thereby secure a place on the official ballot. If for any reason the law precludes a qualified elector and candidate from appearing on the official ballot or precludes any qualified elector from voting for any qualified candidate, the law to that extent would be unconstitutional.

However, the petitioner in this proceeding is in no position to raise this point, and until such a proposition is presented to us by a qualified elector or candidate, who believes he is or has been deprived of an electoral right, guaranteed him under the constitution, we do not deem it necessary to pass upon the law in this respect until such a condition arises and is properly before this court.

In conclusion, it is proper to observe that the political conditions of the country at the present time show that there is a political evolution going on in the legislatures of the various states, attempting to regulate, strengthen, and purify our political system and bring as near to the people as the constitutions of the states of the Union will allow a more direct participation in the selection of candidates and adoption of measures believed to be for the common good. Nevada, in common with the majority of the states of the Union, is abreast of the times in this legislation. In accord with our constitution and the principles herein enunciated, we believe that the power of selecting candidates and the privilege of initiating legislation may be brought as directly in touch with the people as it is possible to do, and that, as soon as the present direct primary system now being initiated is perfected, the various states will adopt this mode of selecting its nominees for office with an equal rapidity as did practically every state in the Union, in the evolution of the effort of securing a more thorough, secret, honest, and independent ballot, adopt the Australian ballot in substitution of the old ballot used for practically over a hundred years.

The Australian ballot law, when it first made its appearance, was attacked as freely as the direct primary measures

are now being assailed. This practice of assailing any innovation or reform in the old-established method of conducting the political welfare of the various parties is neither surprising nor to be criticized or condemned. While all innovations in long-established customs are carefully and seriously to be considered before they are to be accepted as substitutes, and if unconstitutional to be promptly repelled unless the people see fit to amend their constitutions, if they be declared unconstitutional, yet it would be strange and anomalous indeed if the rapid strides and progress which civilization is making in modern times in changing and improving older methods in almost every conceivable sphere if new political reforms and methods were not introduced and adopted in substitution of older established methods to keep pace with the times.

The judgment sustaining the constitutionality of the "Direct Primary Law" is hereby affirmed.